HH

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Larry Dean Porter | ) | Case No.   2:20-mj-374 |
| 9418 Lick Run Lyra Road | ) | |
| Wheelersburg, Ohio 45694 | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____6/1/12 to 3/10/20_____ in the county of _____Jackson and Scioto_____ in the

_____Southern_____ District of _____Ohio_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1591(a)/1594(a) | Child sex trafficking and attempt |
| 18 U.S.C. 1591(d) | Obstructing, attempting to obstruct, or otherwise interfering with the enforcement of § 1591(a) |
| 18 U.S.C. 2251(a) | Production of child pornography |
| 18 U.S.C. 1512(a)(2)(C), (c)(2) & (k) | Witness tampering and conspiracy to tamper with witnesses |

This criminal complaint is based on these facts:

See attached affidavit incorporated herein by reference

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Michael A. Harey, SA FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:     _____May 22, 2020_____

_____
*Judge's signature*

City and state:          _____Columbus, Ohio_____

Chelsey M. Vascura, U.S. Magistrate Judge
*Printed name and title*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**In the Matter of the Criminal Complaint:**

**United States of America**
     **v.**
**Larry Dean Porter**
**9418 Lick Run Lyra Road**
**Wheelersburg, Ohio 45694**

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Michael A. Harey, a Special Agent with the Federal Bureau of Investigation, Columbus
Resident Agency, being first duly sworn, hereby depose and state as follows:

    1.    I, Special Agent Michael A. Harey (your affiant), make this affidavit in support of
a criminal complaint to arrest for violation of Title 18 United States Code Sections 1591(a),
1591(d), 1594(a), 2251(a), and 1512 (a)(2)(C), (c)(2) and (k) – sex trafficking of children,
attempted sex trafficking of children, obstructing, attempting to obstruct, or otherwise interfering
with the enforcement of § 1591(a), production of child pornography, and witness
tampering/conspiracy to witness tamper. Since this affidavit is being submitted for the limited
purpose of securing an arrest warrant, your affiant did not include each and every fact known
concerning this investigation. Your affiant did not withhold any information or evidence that
would negate probable cause. Your affiant set forth only the facts that are believed to be
necessary to establish probable cause that Larry D. PORTER committed the violations listed
above.

    2.    I am a Special Agent with the FBI assigned to the Cincinnati Division and I have
been a Special Agent since October 2008, having worked on counterterrorism investigations and
public corruption investigations as a Special Agent. I am currently assigned to the FBI Child
Exploitation Task Force, investigating matters involving the online exploitation of children and
child pornography. I have made arrests and have executed search warrants pertaining to these
types of investigations. Prior to becoming a Special Agent with the FBI, I served as a U.S.
Border Patrol Agent for approximately five years and a Federal Air Marshall for approximately
five years; having begun my federal law enforcement career in February 1998. While performing
my duties as a Special Agent, I have participated in various investigations involving computer-
related offenses and have executed numerous search warrants, including those involving searches
and seizures of computers, digital media, software, and electronically stored information. I have
received both formal and informal training in the detection and investigation of computer-related
offenses. As part of my duties as a Special Agent, I investigate criminal child exploitation and
child pornography violations, including the illegal production, distribution, transmission, receipt,

and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2252, and 2252A and sex trafficking offenses in violation of 18 U.S.C. § 1591.

3.      In approximately April of 2019, the FBI began investigating Larry Dean PORTER.  The investigation was initiated due to reports from several sources in the Portsmouth and South Webster areas who indicated that PORTER was involved in sexually abusing minors, and that such abuse was occurring with the consent of the minors' parents who were receiving illegal controlled substances from PORTER.  After conducting several interviews, the investigation stalled because additional witnesses could not be interviewed without risking that PORTER would learn of the investigation.

4.      In March of 2020, the investigation into PORTER's drug and sex trafficking activities was revived through information obtained from the Jackson County Sheriff's Office (JCSO).  PORTER was arrested by the JCSO on March 10, 2020, as the result of a human trafficking sting operation, and was indicted in the Jackson County Court of Common Pleas on March 16, 2020, on one count each of Attempted Rape and Involuntary Servitude, in violation of Ohio Revised Code sections 2905.32(A)(2) and 2923.02(A).  During the subsequent investigation since PORTER's arrest and ongoing detention, your affiant has determined that he has attempted to commit sex trafficking of children, has sex trafficked children, has produced child pornography, has obstructed or attempted to obstruct the investigation into his sex trafficking activities, and has tampered with witnesses and/or conspired to do so.

A. **Attempted Sex Trafficking of Children**

5.      In early March of 2020 a Confidential Human Source (CHS1) approached JCSO detectives regarding information she had about PORTER.  Since approximately January 2020 and on numerous occasions, CHS1 has provided reliable information to law enforcement regarding potential criminal activity of others. [1]

6.      According to CHS1, PORTER had contacted CHS1 via telephone in approximately 2013, and offered to provide CHS1 with narcotic pills in exchange for allowing PORTER to "babysit" CHS1's significant other's 2-year-old child.  CHS1 explained that PORTER used the term "babysit" to refer to the time he spent with children during which he sexually abused them or took sexually explicit images of them.  In subsequent interviews with CHS1 after PORTER's arrest, s/he indicated that s/he first met PORTER through a significant other who purchased marijuana from PORTER.  CHS1 also obtained both marijuana and narcotic pills from PORTER in the past.

7.      To corroborate the information provided by the CHS1, the JCSO detective had CHS1 make a controlled contact with PORTER via Facebook Messenger, in which CHS1 was to

_____

[1] CHS1 has worked with JCSO in the past and was in the process of assisting law enforcement in exchange for assistance with charges being faced by her boyfriend.

2

inform PORTER that CHS1 could make a 7-year-old child available to engage in sexual activity with PORTER.

8.     Beginning on March 9, 2020, PORTER exchanged Facebook Messages with CHS1 regarding plans to meet with the 7-year-old girl in exchange for $80 in cash. Your affiant reviewed screen captures of the Messenger communications between CHS1 and PORTER that were created by law enforcement officers who accessed and reviewed CHS1's Facebook account. The communications began on Monday, March 9, 2020, at approximately 1:30 in the afternoon, when CHS1 sent a message saying "Dean." PORTER responded later that evening saying "hello," and an ongoing conversation ensued the following day:



3



/www.facebook.com/messages/t/larry.porter.313924

Erica  Home  Create

**Larry Porter**

wat time

I ain't bein set up am i

I have to ask

Hell no

Ur silly

is it bad news

No I have a friend that has something you might be interested in do u remember what I came out and talked to u about before trading and I flaked out on u

And I've got a lil cash if u possibly had some blues

I don't have a thing right now

sorry

I really can't figure out wat we were talkin about

motorcycles or wat

I mean we could do cash or set up for another day u wanna just meet an eat

My friends daughter is lonely

Type a message...

4





9.      CHS1 and PORTER engaged in further conversations regarding a time and location to meet, with PORTER inquiring how long CHS1 would have custody of the child. As depicted in the screenshots below (redacted to protect the privacy of the child), CHS1 indicated that she could keep the child with her for a while, and that the child's mother was "strung out on h bad," then sent a picture of the child, and explained the situation further, after which she and PORTER negotiated a price:



7



www.facebook.com/messages/t/larry.porter.313924

Q          Erica   Home   Create

**Larry Porter**

She wants 100

For all night or 50 a day after that

might swing 80

Ok let me talk to her one sec

Later tonight I can come if u want

k kool

u gonna b involed

or r u just gonna drop her off

I can't stay jay will b home from work but I can make sure she's comfortable b4 I leave her with u if we take her to McDonald's or something first get her to know u ya know

drive thru

lol

how she gonna get home

u comin to get her

I'll pick her up at ur house yeah we can take here thru the drive thru and drive around with her or

GIF          Type a message...

8



10. As the meeting plan was finalized, CHS1 informed PORTER that the child had engaged in sexual acts previously, but had never had sexual intercourse. She further explained to PORTER that the child knew that she would get a gift for engaging in the sexual acts, and that CHS1 would buy the child something the following morning after she picked the child up from PORTER's house and PORTER paid CHS1.

11. On March 10, 2020, CHS1 arrived at the agreed meeting location, McDonald's in Oak Hill, Ohio, which is located in the Southern District of Ohio, to meet with PORTER. PORTER pulled into the parking lot, exited his vehicle and approached CHS1 inside of McDonald's. The two engaged in a brief conversation, which was recorded via a device that JCSO had provided to CHS1. Agents reviewed that audio recording and found much of the conversation to be inaudible due to background noise inside the McDonalds. However, at one point, PORTER could be heard saying something to the effect that he would be done around

9

midnight and then asked if he could text CHS1. Based on the plans that were established during the Facebook Messenger chats with CHS1, your affiant believes that this statement indicates that PORTER was going to take the fictitious child to engage in sexual activity and would return the child to CHS1 around midnight.

12.    Shortly thereafter, PORTER was arrested by JCSO and informed of his Miranda Rights. PORTER indicated he understood and was willing to speak with JCSO Detectives. PORTER admitted to knowing why he was being arrested. PORTER stated he only agreed to meet with CHS1 to make sure the minor girl wasn't hungry and claimed that he gave CHS1 $10 to get the child some food and was proceeding to leave the McDonald's prior to being arrested. PORTER was transferred to JCSO for processing. At the time of PORTER's arrest, he was found to have $80 in cash on his person and a cellular phone was seized from his vehicle.

13.    On March 10, 2020, an FBI agent also interviewed PORTER. PORTER was informed of his Miranda Rights and he agreed to speak. PORTER admitted that he knew he was being interviewed because of the arrangements to meet the CHS1 at McDonald's with the 7-year-old girl. PORTER stated he communicated with CHS1 via Facebook Messenger, utilizing his Facebook user name "Larry PORTER," on his desktop computer located at his residence, 9418 Lick Run Lyra, Wheelersburg, OH 45694, which is located in the Southern District of Ohio. The following day, PORTER signed consent to search forms allowing FBI agents to search his residence and any computers or computer related media found in his residence. Based on this consent, FBI Agents and members of the JCSO and Scioto County Sheriff's Office (SCSO) searched PORTER's residence on March 11, 2020. Numerous computers, hard drives and other digital devices were found throughout the residence. Officers also noticed a very strong odor of marijuana, although only a very small amount of a leafy green substance appearing to be marijuana was found.

B.  **Child sexual abuse, child sex trafficking and production of child pornography**

14.    As discussed above, prior to PORTER's arrest by JCSO, the FBI had obtained information from various sources indicating that PORTER has sexually abused numerous children in Scioto County, potentially for decades. After PORTER's arrest, your affiant reviewed the information previously obtained from those sources, interviewed additional witnesses, suspects and victims, and obtained additional information from local law enforcement. One of the sources that initially provided information to law enforcement was CHS2, who had direct access to children and family in the Scioto County community where PORTER resided. CHS2 had observed children who were believed to have been previously abused by PORTER grow up and take their own children to PORTER in exchange for drugs and money. CHS2 was able to provide specific examples of children who said they were taken to PORTER's house, and other children that CHS2 observed to have signs of physical abuse after the local child protective services agency began investigating allegations that those children were being abused by PORTER. CHS2 also discussed two named individuals who told CHS2 that PORTER possessed

child pornography, thought to be on flash drives, and that PORTER would go to extremes to conceal the existence of the drives.

15.     The information obtained from CHS2 led law enforcement to additional individuals who had information regarding PORTER's prior sexual abuse of minors. In August of 2019, agents from the FBI and Ohio Bureau of Criminal Investigations (BCI) interviewed VICTIM 1, an adult who resided with PORTER for approximately seven years when she was a minor. VICTIM 1 stated that her mother became addicted to drugs that PORTER exposed her to, including norco, klonopin, valium, Percocet, oxy, and marijuana, and that she observed multiple drug addicted parents bring their children to PORTER's house. VICTIM 1 was able to provide the name of one specific adult female and the name of the female's minor daughter, who she knew had been sexually abused by PORTER in exchange for drugs for the mother. VICTIM 1 also described trips she took with PORTER to Columbus, during which she observed PORTER exchange money for drugs.

16.     VICTIM 1 further revealed that PORTER had also sexually abused her when she was a child. The abuse began with PORTER masturbating in front of VICTIM 1, but later involved PORTER forcing VICTIM 1 to masturbate him herself, and eventually progressed to oral and vaginal sex. Several years prior to the oral and vaginal sexual abuse, PORTER had begun giving VICTIM 1 drugs and alcohol. VICTIM 1 became drug addicted by the time she was 15 years old, but has stopped using drugs since she left Ohio several years ago.

17.     VICTIM 1 stated that PORTER hid cameras in the living room of his residence to record her performing sexual acts. VICTIM 1 stated that she had seen files on PORTER's computer that depicted PORTER having intercourse with her, and multiple files from when she was younger and PORTER would masturbate over her. VICTIM 1 described finding several similar folders on the desktop of PORTER's computer: one contained videos that PORTER had downloaded, one of which depicted two children, maybe 8 years old "messing around;" and a webcam folder that contained the videos of PORTER engaging in sexual activities with VICTIM 1. The last sexual encounter VICTIM 1 had with PORTER was in 2008, when she was approximately 15 years old. She further indicated that she did not report the abuse while she was living with PORTER because she was afraid for the safety of her mother and brother.

18.     VICTIM 1 further described that PORTER had a "trapped door" located inside of his residence, in which she believed that he stored marijuana and related drug distribution items. VICTIM 1 stated the door was located in the living room area under the carpet where the residence was adjoined together.

19.     VICTIM 1 also discussed an associate of PORTER's, who later became known to law enforcement and is described below as CHS3. According to VICTIM 1, CHS3 suspected that PORTER was abusing VICTIM1 and also would have first-hand knowledge of PORTER's abuse of other minor girls.

11

20.    Based on the information obtained from CHS1, CHS2, VICTIM 1, and other individuals, agents searched SCSO records for any reports regarding allegations of sexual abuse by PORTER.  Agents discovered a report from February 2009, from the Adult Protective Services (APS), providing information regarding a victim of sexual assault, VICTIM 2. VICTIM 2 had provided APS information regarding physical and sexual abuse he suffered at the hands of PORTER from the time VICTIM 2 was nine years old until May 2008.  VICTIM 2 reported that PORTER anally penetrated VICTIM 2 and forced VICTIM 2 to perform oral sex on PORTER.  VICTIM 2 also stated that PORTER had sexually assaulted the VICTIM 2's sibling, VICTIM 1 (as described above) by having intercourse with her. VICTIM 2 reported PORTER also had sex with the VICTIM 2's girlfriend, a 14-year-old female.

21.    According to SCSO documents, in March 2009, VICTIM 2 met with SCSO deputies and reiterated to them that PORTER had been raping him since he was 7-years-old. VICTIM 2 also stated that PORTER had threatened to kill VICTIM 2, VICTIM 1, and their mother if VICTIM 2 disclosed the abuse to anyone.  PORTER had a gun and had shot off several rounds at the time he made this threat to VICTIM 2.

22.    According to conversations with SCSO detectives, both VICTIM 1 and VICTIM 2 later recanted their allegations against PORTER.

23.    VICTIM 1 and VICTIM 2 were interviewed again by your affiant in May of 2020. VICTIM 1 confirmed what she had said during her initial interview, and also stated that at least one of PORTER's two younger daughters was present at PORTER's residence when PORTER kissed VICTIM 1 and claimed that VICTIM 1 was his girlfriend.  VICTIM 1 was still a minor at that time.  VICTIM 2 confirmed that he also resided with PORTER as a child, and that PORTER physically and sexually abused him, including oral and anal rape, beginning when VICTIM 2 was six years old and continuing until VICTIM 2 moved out of PORTER's house when VICTIM 2 was approximately thirteen years of age.  VICTIM 2 also observed several women visiting PORTER at his residence, and PORTER would make VICTIM 2 leave the residence when two of those women, identified below as SUSPECT #3 and the mother of VICTIM 5, would come to the residence with their minor children.  VICTIM 5 and her mother were the individuals that VICTIM 1 had previously identified by name as individuals who visited PORTER's residence in order for the minor child to be sexually abused in exchange for drugs given to the mother.

24.    Returning to the days immediately following PORTER's arrest by the JSCO, information was provided to law enforcement by CHS3, a person known to have direct visible access to PORTER's residence, who has known PORTER for decades, and who VICTIM 1 said had first-hand knowledge of PORTER's sexual abuse of children. CHS3 provided information about PORTER's two oldest daughters, Denna and Crystal Porter, and other friends of PORTER making numerous trips to PORTER's residence and surrounding property and taking items from the residence and property. CHS3 further indicated that PORTER's two eldest daughters were seen outside the residence digging holes in the ground surrounding PORTER's residence.  CHS3

12

also confirmed the existence of a trap door in PORTER's residence, and was able to provide a more specific location regarding that trap door.

25. On March 20, 2020, agents obtained and executed a search warrant at PORTER's residence, based on the information provided by CHS3 and another source, indicating that additional evidence of criminal offenses was still located at the residence. During the search, agents located the trap door described by VICTIM 1 and CHS3. The open hole that the trap door led to was empty, as were several other storage areas and spaces above ceiling tiles. There was no longer any detectable odor of marijuana in the residence.

26. Officers searching the property observed the area described by CHS 3 where Deanna and Crystal Porter were observed digging. Officers dug in that area and located a 2GB SD memory card held within a sealed glass jar. Forensic examination of that device revealed the presence of three images depicting an identified adult female sexually assaulting a minor female child (VICTIM 3). One of the images depicted VICTIM 3 nude on a bed with her legs toward the camera and her nude genitalia in the very center of the photograph. The nude body of an adult female was visible sitting beside child. The second image depicted the same nude child in the same position, with the adult female leaning over her such that her face was visible. The third image depicted the back of the head of the adult female leaning over the genital area of VICTIM 3, appearing that the adult female was performing oral sex on the child. The background of the images clearly show that they were taken inside the bedroom of PORTER's residence. Upon review by SCSO detectives, the identity of both the adult female and VICTIM 3 depicted in the photos was confirmed. CHS 3 had previously informed local officials that PORTER had forced this identified female to perform sexual acts on her child while PORTER recorded it, in exchange for drugs.

27. On March 21, 2020, the identified female depicted in the photographs described above (hereinafter SUSPECT #1) was arrested on local charges of Rape. At the time of her arrest, SUSECT #1 initially made voluntary disclosures regarding the identity of the child depicted in the pictures described above.

28. During a subsequent recorded interview, SUSPECT #1 was informed of her Miranda Rights and waived those rights. She then disclosed the following, amongst various other things about PORTER and his associates:
- SUSPECT #1 initially met PORTER in approximately 2008, when she began purchasing marijuana from him;
- SUSPECT #1 subsequently started using, what she described as "H," which your affiant believes means heroin;
- PORTER always had pain pills, some of which he sold, but most of which he "kept for his girls";
- Beginning in approximately 2008 and continuing for numerous years, PORTER made SUSPECT #1 do sexual things, first with him, then with other females, including minor females, in exchange for marijuana, cash cigarettes, and what she described as "30's", which she said were pain pills, including

13

oxycodone, that she took in order to avoid using heroin and PORTER frequently recorded the sexual acts;

- PORTER's sexual abuse progressively became more forceful, and he told her that he made the recordings of the sex acts so that she and the other women could never tell on him or else they would also get in trouble;
- SUSPECT #1 named numerous additional adult females who obtained drugs from PORTER in exchange for sexual acts with him and with other females, including the minor children of the adult females;
- On one occasion, SUSPECT #1 walked into PORTER's residence and observed him touch the nude breast and genitalia of a minor child known to SUSPECT #1
- SUSPECT #1 was aware of PORTER sexually abusing VICTIM 1 and VICTIM 2, because they both informed her of the abuse;
- SUSPECT #1 walked into PORTER's residence on one occasion in approximately 2008, and observed an adult female engaging in sex acts with her minor daughter while PORTER watched and masturbated;
- SUSPECT #1 was shown the pictures that were recovered from PORTER's SD card. She identified herself and the child who she estimated to be 7 or 8 years of age at the time the pictures were taken; stated that PORTER took the photos in approximately late 2012 to early 2013; the sex acts occurred in PORTER's bedroom; and in one of the pictures, an item visible on her arm was duct tape that he placed there to force her to actually touch the child's genitalia;
- PORTER got pain pills from an identified individual who arranged for the pills to be brought in from Florida;
- Frank Andrews was an associate of PORTER's, who exchanged drugs for sex with drug-addicted females, including SUSPECT #1, and PORTER would sometimes sell pills to Andrews;
- SUSPECT #1 also identified David Cole as an associate of PORTER's who had sex with the drug-addicted women that PORTER was controlling through his drug provision;
- PORTER utilized phones, including landlines, cell phones and social media, to communicate with her and other drug addicted parents to arrange meetings with the parents and their minor children for the exchange of drugs and cash for sexual activity with or by the minor children;
- SUSPECT #1 observed things that PORTER was looking at on the internet, which included pictures of children being sexually abused.

29.     Two of the adult females that SUSPECT #1 had identified as obtaining drugs from PORTER in exchange for providing their minor children to be sexually abused were arrested on March 21 and 22, 2020 and charged with Complicity to Commit Rape or Rape. SUSPECT #2 admitted that she exchanged sex with her children (VICTIMS 3 and 4) by PORTER and SUSPECT #1 for drugs and money. SUSPECT #3 admitted to law enforcement that she exchanged sex with children she had access to for drugs she received from PORTER.

Both women admitted that they either provided their minor children to PORTER for sexual purposes or engaged in sex acts with their minor children at PORTER's direction, in exchange for drugs, including Oxycodone and marijuana, and cash.

30.     VICTIM 3 and VICTIM 4 were forensically interviewed on March 23, 2020. VICTIM 3, who was born in 2008, confirmed that she was anally and vaginally penetrated by PORTER, that SUSPECT #1 was sometimes involved in the abuse, that PORTER sometimes took pictures of her while she was nude and/or engaged in sex acts, that she was depicted in the pictures recovered from the SD card found on PORTER's property, and that SUSPECT #2 (her mother) and SUSPECT #1 received drugs and money from PORTER. VICTIM 3 also revealed that she was given "candy" by PORTER and described the candy as a white pill. VICTIM 4 did not make any disclosures to the forensic interviewer, claiming that "nothing happened" and she was a virgin. However, when VICTIM 4 spoke to law enforcement officers and agents, VICTIM 4 also admitted that she had been sexually abused by PORTER in exchange for her mother, SUSPECT #2, receiving pills and money, and that PORTER had sometimes recorded the abuse. She also confirmed that SUSPECT #1 had been involved in the abuse. PORTER had also provided her with some sort of pills, but she only pretended like she took them. Both VICTIM 3 and VICTIM 4, as well as VICTIM 5, who indicated that she did not remember being abused by PORTER, but recalled being at his residence and claimed she might have traumatic memory loss, confirmed that they observed visual recording devices within PORTER's residence. As indicated above, both VICTIM 1 and VICTIM 2 have indicated that they know that VICTIM 5 was taken to PORTER's residence by her mother and was sexually abused by PORTER in exchange for drugs for the mother.

31.     Corroborating the above information from SUSPECT #1, SUSPECT #2, VICTIM 3 and VICTIM 4, your affiant reviewed Facebook conversations obtained via a search warrant served on Facebook for the content of PORTER's account, which revealed conversations between SUSPECT #2 and PORTER that confirmed that SUSPECT #2 received narcotics from PORTER and that SUSPECT #2 coordinated sex with VICTIM 3 and VICTIM 4 in exchange for narcotics and money. For instance, on April 4, 2019, SUSPECT #2 wrote to PORTER, "Are we coming over today? They thought we was staying over there yesterday." PORTER responded, "Don't have much money right yet. Only 42 bucks right now. Poor little darlings." SUSPECT #2 responded, "We coming over since we didn't last night. They been wanting to lol. Nothing being aggravated by the girls they are wanting to come over lol." On April 8, 2019, PORTER wrote to SUSPECT #2 indicating he had Oxycodone, "I got some 10's." SUSPECT #2 responded, "Yeah. How much we ain't got no money." PORTER responded "17." On April 9, 2019, the conversation continued, "We coming over today. The girls want to come over." PORTER responded, "don't have much bucks, let me check an c." Later on the same day PORTER wrote to SUSPECT #2, "got 46 bucks but I get the feelin they [VICTIM 3 and VICTIM 4] don't wanta play anymore." SUSPECT #2 responded, "No they was just confused the other day." On April 18, 2019, PORTER was discussing VICTIM 3 and VICTIM 4 coming

15

over the next day after school, culminating in PORTER asking, "They good and horny?" On April 22, 2019, SUSPECT #2 wrote to PORTER asking if PORTER was picking up SUSPECT #2, VICTIM 3 and VICTIM 4 that day. PORTER responded asking, "r they goin through all the way today? By theirself." SUSPECT #2 responded, "I been talking to them about it." PORTER responded, "Treid of being teased lol." SUSPECT #2 responded, "I been talking for 2 days." PORTER then directed that they start walking to the specified business where, as will be further detailed below, was a common location for PORTER to pick up SUSPECT #2, VICTIM 3 and VICTIM 4. On April 26 2019, PORTER and SUSPECT #2 discussed a sexual encounter PORTER had with VICTIM 3 and VICTIM 4 the night before. PORTER wrote, "bet [VICTIM 4] feels good today after last night." SUSPECT #2 responded, "Oh yeah lol." PORTER then asked, "Wonder why she won't go back by herself." Then he wrote, "boy oh boy [VICTIM 4] sure got off good last night." SUSPECT #2 responded, "Yeah she did twice." PORTER responded, "yippers." On May 25, 2019, SUSPECT #2 and PORTER discussed VICTIM 3's and VICTIM 4's willingness to continue to have sex with PORTER. PORTER initiated the conversation by saying, "Morning, guess the girls don't wanna come over anymore eh?" SUSPECT #2 responded, "Well [VICTIM 3] is off of it now and [VICTIM 4] just don't wanna go back by her self." PORTER asked, "Wonder why?" SUSPECT #2 responded, "I don't know something about she likes it when I help she just feels more comfortable." Again on June 2, 2019 PORTER wrote to SUSPECT #2, "wish I had some pussy." SUSPECT #2 responded, "lol they been wanting to come over," meaning VICTIM 3 and VICTIM 4. On July 13, 2019, PORTER and SUSPECT #2 discussed meeting up so SUSPECT #2 could buy some "10s and 20s," which your affiant believes are oxycodone. Within this conversation PORTER also requested SUSPECT #2 bring either VICTIM 3 or VICTIM 4 saying, "and the one by herself."

32.     On March 21, 2020, during a jail call between PORTER and Denna Porter, Denna made PORTER aware that law enforcement found a glass jar found with digital devices in it. PORTER the asked, "they found the glass jar?" Denna responded, "yeah, they found a glass jar filled." PORTER responded, "Well, all they found was some girl eatin' pussy" PORTER then specifically named SUSPECT #1 was in the image. PORTER then laughed and said, "no big deal." When Denna asked who should not trust and who knew about the glass jar, PORTER said CHS3 knew and he again said, "it was just some girl eatin' pussy anyhow." PORTER then said, "I don't take no faces, so no worries." Continuing to talk about the glass jar, PORTER said he told CHS3 about it and said, "you probably tried to dig it up too, remember… thought it was money?" Denna responded, "yeah, well, I went tried to go get, try to find that money." PORTER replied, "yeah, well it wasn't money, it was just some little old flash drive of a thing and it's just got [SUSPECT #1] eatin' pussy." Denna and PORTER continued their discussion about who to trust and who not to trust. Denna indicated it was CHS3 who told her to dig for money and thought he was trying to get her into trouble. PORTER told Denna she could trust Dave, meaning Dave Cole. Later in the call, Denna told PORTER she discussed with CHS3 what was in the glass jar, and CHS3 told Denna names of who was on the SD card, but then said they should not discuss it on the phone. Based on PORTER's description to Denna about what was on the SD

card, your affiant knows the SD card PORTER described and the SD card law enforcement found buried on the property are one and the same.

33.     On April 20, 2020, an interview was conducted with CHS 6 and CHS 7, the owners/operators of a business that is located near where SUSPECT #2, VICTIM 3 and VICTIM 4 reside.  CHS 6 and CHS 7 provided knowledge of SUSPECT #2 and her children, VICTIM 3 and VICTIM 4, being picked up at a location near their property. CHS 6 and CHS 7 have direct knowledge of who PORTER is and observed PORTER interact with VICTIM 3 and VICTIM 4. CHS 6 observed VICTIM 3, VICTIM 4, SUSPECT #2, and SUSPECT #2's boyfriend, being picked up at CHS 6's business by PORTER in a blue and grey Camaro. CHS 7 indicated it had been going on for a long time, and right up until PORTER was arrested. CHS 7 also observed a male in a grey El Camino come by and pick up SUSPECT 2, her boyfriend, VICTIM 3, and VICTIM 4. Your affiant knows PORTER's co-conspirator, Frank Andrews, to drive a grey El Camino, matching the description provided by CHS 7.

34.     Further corroborating the aforementioned information that PORTER and Frank Andrews used to pick up SUSPECT #2, VICTIM 3 and VICTIM 4 for PORTER to have sex with the victims, your affiant obtained information through a search warrant served on Facebook for the content of PORTER's account that revealed conversations between PORTER and SUSPECT #2. On April 7, 2019, PORTER wrote, to SUSPECT #2, "pick u up at the [CHS 6 & 7 business] at 4." On April 18, 2019, PORTER asked SUSPECT #2, "5 till 4 at [CHS 6 & 7 business]? Hey. U here. [SUSPECT #2 boyfriend] gonna pick u up on his way home?" SUSPECT #2  then responded, "Pick us up from your house. I guess he can." PORTER then told SUSPECT #2, "talk to VICTIM 3. Tell her to let it go in." SUSPECT #2 responded, "Ok. We are here." Your affiant believes the reference to "it" is PORTER's penis. On April 19, 2019, SUSPECT #2 wrote, "We are here. I thought you was coming by." PORTER responded, "what time you leave from there?"  SUSPECT #2 responded, "I'm not sure for the next while though." PORTER responded, "me n frank b there shortly. 20 mins maybe. Or so."

35.     A review of search warrant returns from Facebook for PORTER's Facebook account revealed numerous conversations with many of PORTER's co-conspirator's family and associates, wherein he discussed his sexual abuse and interest in VICTIM 3 and/or VICTIM 4. For instance, on July 24, 2020, PORTER send a Facebook messenger text to his daughter Barbarajoe Porter that included an image of VICTIM 4.  Referencing the image, PORTER told Barbarajoe, "this is my girlfriend, please don't show anyone ok." Barbarajoe responded, "really." PORTER then said, "isn't she pretty."  Barbarajoe responded, "I told u not to talk to me about that shit u realize ur grand daughter is probably the same age."  PORTER responded, "lol, but she not my granddauther. I couldn't b with my own family."  Barbarajoe then said, "I know but she's young dad shit there's still good looking ones that's over 18. I know I was just saying the age guber."  PORTER then said, "that's true but this 1 is stoned dead in love." On April 4, 2020, PORTER had a messenger conversation about VICTIM 3 and VICTIM 4 with Dave Cole.

PORTER wrote, "I just lied to [SUSPECT #2], back me up, I told her I don't have enough gas to come get em and take em home. Told her dave was bringing me out a can of gas and then will see." He continued, "yeah, they wanted to come over this morning at 8. [VICTIM #2's boyfriend] was gonna drop em off and take em back home whien I get done with em lol. Man it's hard to turn down pussy. Lol" Cole later wrote, "Well did the girls make it." PORTER responded, "yippers and gone." Cole responded, "lol." On April 25, 2020, PORTER wrote to Cole, "VICTIM 4 wants to come over so bad she not going to 4 H this evening." Cole responded, "LOL." Cole then asked, "Are you there." PORTER responded, "am right now. But I'm fixin to get my thing wet. lol. u no." Again on June 30, 2019, PORTER wrote to Cole, "man that [VICTIM 4] sure is a hottie ain't she." Cole responded, "Yeah she sure is." PORTER continued in reference to VICTIM 4, "lives from day to day I can't get her outta my head. I hope to marry that 1." On August 23, 2019, PORTER again wrote to Cole, "I ain't horny now." Cole responded with a thumbs up image. PORTER continued, "[VICTIM 4] this time, put it all over me. She got off 8 times." Cole responded with another thumbs up image. PORTER continued to talk about VICTIM 4's recent visit saying, "beds wet. Gonna have to wash my sheets." On September 13, 2019, PORTER wrote to Cole in reference to VICTIM 3, "had me some 11 yr old last night. U no who." On October 7, 2019, PORTER wrote to Cole in reference to having sex with another female, "the only thing that could stop me from ridin is if [VICTIM 4] wants to come over. Lol. Getting some pussy." On October 15, 2019, PORTER again wrote to Cole, "[VICTIM 3] skiped school today n wants to come over." Cole responded, "Oh yeah." PORTER responded, "yeah." On October 16, 2020, PORTER wrote to Cole, "just took [VICTIM 5] back to webster. Lol." Cole responded. "lol.'

## C. Obstruction of a sex trafficking investigation and witness tampering/conspiracy

36.     As indicated above, two of PORTER's daughters, Crystal and Denna Porter, as well as associates of PORTER's, Dave Cole and Frank Andrews, were observed at PORTER's residence in the days after PORTER's arrest. Records from the JCSO jail indicated that Crystal, Denna and Dave Cole visited PORTER on March 14, 2020, near to the time that they were observed at PORTER's property. In light of the evidence that was found buried in PORTER's yard and the statements by numerous co-conspirators, witnesses and victims regarding the frequency with which PORTER recorded sexual abuse of minors, your affiant has reason to believe that other devices containing such recordings were at some point in PORTER's residence or buried in the surrounding property. Search warrants were executed at the residences of Denna, Crystal, Cole and Andrews on March 24, 2020, in an attempt to locate any such devices that they may have removed from PORTER's residence after his arrest. No child pornography that PORTER produced has been found to date, but discs containing child pornography were found in both Andrews and Cole's residences. All of the individuals were interviewed at the time the search warrants were executed at their residences, and all denied removing any digital devices from PORTER's residence. However, communications recovered from their cell phones and from the content of their Facebook accounts that were obtained via search warrant suggests that they did in fact remove such devices from PORTER's residence:

- In Facebook conversation on March 12, 2020 that was recovered from Crystal's phone, Crystal discussed with another associate of PORTER, ███████ the activities occurring at Porter's residence that day. Crystal asked, "Have the cops been to his house yet, and did Denna get in the house?" ███████ responded, "Yes they [law enforcement] took all the computers and ad cards." Crystal asked, "Cards?" ███████ responded, "Yes Denna and Frank and Dave and Ashley are packing shit now." Crystal asked, "What are they packing?" ███████ responded, "SD memory cards forvphones or cameras."

- In order to follow up on information Denna Porter provided at the time the search warrant was executed at her residence, your affiant and another agent went to Denna's residence on May 5, 2020. During that interview, Denna informed agents that when she was at Porter's residence on or about March 12, 2020, Dave Cole had given her a black coffee container that contained various digital devices. Denna consented to agents taking the coffee container, which was found to contain numerous RAM drives and an 8GB SD card. A forensic examination of the SD card revealed a file that was created when the card was connected to a Windows-operating system to view the contents of the card. That file was created on March 17, 2020 at approximately 1:49 PM, showing that the card was connected to a computer using a Windows operating system at that date and time. The card also contained approximately four child pornography video titles that had been deleted in 2018. However, your affiant was able to recover and view one of the videos and confirmed that it depicted child pornography. A forensic examination of Denna's cellular telephone, revealed the following March 17, 2020, conversation that occurred between Denna and Crystal between approximately 6:41 PM and 6:43 PM over Facebook messenger:

  □ Denna: Nothing on that
  □ Crystal: ?
  □ Denna: From earlier
  □ Denna: Nothing on it
  □ Denna: Just regular stuff
  □ Crystal: Oh
  □ Crystal: Damn
  □ Crystal: Would been nice if it was lol

Your affiant believes this conversation was about the SD card that agents discovered in Denna's possession on May 5, 2020, that Denna accessed the SD card on March 17, 2020 to verify if the SD card contained evidence of Larry Dean Porter's sexual activity with children and that Denna shared her findings about the SD card with Crystal on the same day. Your affiant believes Crystal was

19

displaying her disappointment that the SD card did not contain the evidence they were looking for.

37.     In light of other actions that PORTER has taken in an attempt to thwart the ongoing investigation of his activities, as described below, combined with the fact that three of the four individuals present at PORTER's residence visited him at the jail near in time to their visits to his residence, your affiant believes that PORTER directed one or more of the above-described individuals to remove digital devices from his residence.

38.     The FBI has obtained recordings of phone calls that PORTER has made since he has been incarcerated at the Jackson County jail and three letters he sent from the jail. These calls show that he has been attempting to have his family members and associates lie under oath, convince other witnesses to lie to law enforcement, or to convince sources not to provide information to law enforcement.

39.     On March 17, 2020, PORTER made a call to Denna Porter, during which Crystal Porter and Frank Andrews also communicated with PORTER. During his conversation with Andrews, the following exchange occurred:

> PORTER: Hey man you need to be witness for me. You saw what was wrote on that thing, right?
> Andrews:  Yeah. Right.
> PORTER: You can come up here and be a witness for me then. You tell Mike.[2]
> Andrews: I will.
> PORTER: You need to talk to Mike and let Mike know too. Cause you seen right on there what was said. Remember I told em, I said hey you need to get this kid in a safe place. Remember that?
> Pause
> Andrews: Yeaaaah, I (pause)
> PORTER: Yup
> Andrews: I try and remember

40.     During various communications between Crystal, Denna and ████████████, they discussed their belief that CHS3 was one of the individuals responsible for PORTER's arrest. PORTER also believed that CHS3 was working with law enforcement and in recorded calls that he made from jail, he suggested to Denna Porter and his cousin, Wayne Porter, that they find ways to prevent CHS3 from continuing to provide information to law enforcement:

> a. On April 8, 2020, PORTER spoke with Wayne Porter, and Wayne said he had a long talk with Denna and Crystal and that they were both worried about what CHS3 was trying to do, and they asked Wayne what they should do. As Wayne and PORTER discussed CHS3's mental state and their belief that CHS3 had a firearm, Wayne assured PORTER that he "got some things working there, trying

---

[2] "Mike" is a reference to Porter's attorney, Mike Mearan.

to take him down." Wayne further described to PORTER that Wayne had driven by PORTER's residence recently and given CHS3 a "good hard scour."

b. In a conversation with Denna on April 9, 2020, PORTER suggested that she contact law enforcement about a gun that CHS3 allegedly carried in order to get him put in jail.

c. In a call on April 10, 2020, Wayne suggested to PORTER that CHS3 was "in this a little deeper than we think."

d. In a call on April 12, 2020, Denna told PORTER that she believed that CHS3 was "working with the law."

e. In a call on April 13, 2020, PORTER discussed CHS3 with Wayne, and told Wayne, "Go out and make sure that idiot don't do something. If you have to put a slug in that son-of-a-bitch."

41.     In a recorded call that PORTER placed on April 17, 2020, he asked Denna for her home address so that he could send her a letter because there was something he wanted to tell her but didn't want to say it over the phone. Denna stated that jail staff would read his letters, and PORTER stated that they did not read outgoing mail, according to what he was told. PORTER further stated that he just wanted Denna "to go out there and do something."

42.     Based on this April 17 phone call, in early May your affiant spoke with officials at the Jackson County Sheriff's Office about monitoring mail sent by PORTER from the jail. A clerk at the jail informed your affiant that PORTER had not placed any mail into the jail's postal system during the time he had been incarcerated there.

43.     In a call PORTER placed to Denna on April 22, 2020, he inquired whether Denna had received the letter he sent. Denna confirmed that she had received it that day. PORTER asked Denna to do what the letter said. Denna said "Well, I can't go back out there with the kids." She further stated that she let CHS3 read the letter and he said not to. She said she did not want PORTER mad at her, but she couldn't do it because "they're trying everything they can just to get me in trouble," and she didn't want to lose her kids.

44.     Based on this information, a second search warrant was obtained for Denna's residence. During the execution of that search warrant, Denna informed agents that she had turned the letter over to PORTER's attorney, Mike Mearan. Your affiant went to Mearan's office and inquired about the letter. Mearan turned the letter over to your affiant. Review of the letter revealed that PORTER requested that Denna go to his house and bleach his bed as well as other items in his house. PORTER had previously been informed by Deena, via recorded jail conversation that PORTER's daughter in law believed that the FBI had taken all of his bedding to test for DNA. Your affiant believes that this conversation led PORTER to believe that law enforcement was going to return to test his bed as well.

45.     After this issue arose with the first letter that was sent without law enforcement's knowledge, officials at the Jackson County jail began monitoring PORTER's outgoing mail in accordance with jail policies as outlined in jail manuals and handbooks that are provided to

inmates. Two letters were opened and taken into the possession of jail officials. Your affiant was later provided with copies of these letters. The first letter was addressed to PORTER's daughter-in-law and listed PORTER's name in the return address. This letter requested that the daughter-in-law tell SUSPECT #2 that he had not gotten her in trouble, and that it was in fact SUSPECT #1 that had gotten SUSPECT #2 in trouble. PORTER also requested that the daughter-in-law track down VICTIM 1 and VICTIM 2, and ask VICTIM 1 not to go against him at trial. The second letter was addressed to Denna, and the name in the return address was Russell. Your affiant believes Jeffrey Russell to be an inmate in the Jackson County Jail with PORTER, and that PORTER used Russell's name to evade law enforcement's detection of this letter. In the letter, Denna was given a phone number for CHS1 and told to contact CHS1 and offer CHS1 $500 to get the Jackson County Detective to drop the case.

46.     Based upon the above information, your affiant believes there is probable cause to believe Larry D. PORTER has committed violations of Title 18 United States Code Sections 1591(a), 1591(d), 1594(a), 2251(a), and 1512(a)(2)(C), (c)(2) and (k), sex trafficking of children; attempted sex trafficking of children; obstructing, attempting to obstruct, or otherwise interfering with the enforcement of § 1591(a); production of child pornography; and witness tampering/conspiracy to witness tamper. Therefore, your affiant respectfully requests this court issue a criminal complaint and arrest warrant.

Michael A. Harey
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 22nd day of May, 2020.

Chelsey M. Vascura
United States Magistrate Judge
United States District Court
Southern District of Ohio

22