**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No.: 2:20-CR-095(1)** |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **LARRY DEAN PORTER** | : | **JUDGE SARAH D. MORRISON** |

## SENTENCING MEMORANDUM OF THE UNITED STATES

For decade after decade, Larry Dean Porter ("Porter" or "the defendant") terrorized small, rural communities in Scioto County by forcing vulnerable women to serve his sexual desires and those of his friends and preying on rampant addictions that led parents to commit the unfathomable act of selling their children to a rapist. The fear he instilled in his victims and friends alike allowed Porter to continuously commit these atrocities, unchecked by law enforcement and unaccountable in the criminal justice system. Porter's reign of terror finally ended on March 10, 2020, when he was arrested by the Jackson County Sheriff's Office for trying to purchase a seven-year-old child. On March 14, 2023, Porter will finally be held accountable for the abuse he inflicted on numerous women and children when this Court imposes a sentence commensurate with the harm caused by the more than 40 years that Porter has been acting on his violent and deviant sexual desires. That sentence should be the maximum allowed by the plea agreement, 55 years of imprisonment.

I. **BACKGROUND**

   A. *Through drugs, threats and violence, Porter controlled his victims and made his crimes all that more difficult to uncover.*

In 2018, law enforcement from Columbus conducted a training in Scioto County on human trafficking. One of the attendees reached out to the officers when the training ended,

expressing concern that some students at a school in the area, whose parents were addicted to drugs, might be victims of sexual abuse or sex trafficking. At a later meeting, the concerned citizen gave officers a book entitled "Scioto County Dean Feed" and stated that the citizen, because of his/her position in the community, had been approached by others who had reason to believe that some of the information in the book was true. The book contained numerous allegations of drug trafficking, violence, and intimidation by Porter, as well as innuendos of child sexual abuse. The concerned citizen indicated that the corroborative reports s/he had received related to child sexual abuse occurring with the consent of drug-addicted parents.

Throughout 2019, agents and investigators with the Federal Bureau of Investigation (FBI) and Ohio Bureau of Criminal Investigation (BCI) attempted to locate witnesses willing to discuss the allegations the concerned citizen had raised. Their efforts led to siblings D.Y. and S.L., whose mother had married Porter when they were eight and six years old respectively. After their mother became drug-addicted, Porter began sexually abusing both children. Eventually, Porter kicked their mother out of his house, but maintained custody of both children, treating then 15-year-old D.Y. as his girlfriend. In addition to submitting to Porter's sexual assaults, D.Y. had to say that she loved Porter to those who asked. If she didn't, or if she or S.L. told anyone about the abuse, they believed that Porter would carry out his threats to harm or kill them or their mother. Their fear was based not only his threats and past abuse of him, but also his association with people they knew or believed to be involved in the Scioto County Criminal Justice System.

After interviewing D.Y. and S.L., law enforcement attempted to reach out to others identified as potential co-conspirators or victims of Porter. Like much of the information provided by D.Y. and S.L., potential witnesses had more historical information rather than

information on current victims. Many of the witnesses talked about the "Dean Feed" book and some believed that they knew who the minor victim discussed therein was. However, like others believed to be involved with Porter at that time, the guardians of the minor were suspected to be loyal to or afraid of him.

Beyond the inability to contact suspected co-conspirators or victims of Porter for fear of tipping him off, the FBI also could not employ many of their traditional investigative techniques. Both traditional and electronic surveillance were nearly impossible due to the remote location of his residence and the likelihood that his neighbors were as loyal to or afraid of him as were his co-conspirators and victims. The same loyalty/fear issue also created concern for attempting to use any informants. Even working with the local Scioto County Sheriff's Office was concerning given the reports from witnesses that Porter had connections within that agency. Thus, it was not until a law enforcement agency in a neighboring county began working with an informant who had severed ties with Porter that further progress was made in the investigation.

B.    *But for those who spoke up and law enforcement intervention, Porter would have continued to sexually abuse children and feed addiction in others.*

In early March, a confidential informant (CI) working with the Jackson County Sheriff's Office (JCSO) to conduct drug trafficking stings informed the Sheriff's Office detectives that she believed she could do a sting to catch a child predator. Several years prior when the CI was buying pills from Porter, consistent with his *modus operandi*, Porter had offered the CI free pills in exchange for alone time with her boyfriend's approximately two-year-old child. This was but one of several events that the CI experienced or heard about that led her to believe that Porter would be willing to pay for a young child if she made the offer. The JCSO detectives monitored the CI's Facebook Messenger account as she initiated communication with Porter, who wasted no time in agreeing to the deal. Less than 24 hours later, on the evening of March 10, 2020, he

arrived at the agreed-upon meeting place, the $80 to pay for the child in his pocket, and told the CI that he would be done with the girl around midnight. Upon hearing this, the JCSO detectives arrested him. Their next step was to call the FBI.

The investigation that followed was far from straightforward. Although the FBI and sheriff's deputies from both Scioto and Jackson counties immediately went to Porter's residence to search it, the stories that the FBI heard previously about Porter having numerous hiding places for his trove of drugs and child pornography proved to be true. Their efforts were further hindered by the actions of Porter's friends and family – later coconspirators – who continued to do his bidding and attempted to locate evidence before law enforcement could do so. But their obstructive efforts such as digging in Porter's yard caught the attention of another CI, which provided law enforcement with its next big break. Another search of Porter's property – this time focusing on the area in the yard where the family had been digging – yielded a thumb drive. On that thumb drive were three images. The images depicted a nude adult woman, on the bed in Porter's bedroom, appearing to perform oral sex on a naked little girl. Local law enforcement knew exactly who the woman and child were – Tasha S. and a daughter of Kathy M.

Tasha and Kathy were arrested within a day or two of the discovery of the photos on the thumb drive. During their initial post-arrest interviews, the women tearfully admitted their severe drug addictions, their fear of Porter, and the unspeakable things they did with or to both of Kathy M.'s young daughters. Both also identified other women who sold their children to Porter, including Charity Rawlins and Magan R. This information led to the arrest of Magan R. and interviews of Kathy M.'s daughters and Charity Rawlins' child. The children were initially reluctant to admit or discuss the horrors to which they had been subjected. All three eventually admitted that Porter sexually assaulted them for years and provided them drugs, that their

mothers knew of the abuse, and that their parents received drugs from Porter in exchange for allowing the sexual abuse.  Rawlins' daughter also corroborated her fear of Porter and the violence she had seen him inflict.

C.    *Lacking all remorse, Porter tries to save himself and punish those who cooperated with law enforcement to hold him accountable.*

Once the flurry of activity involving the identification and arrest of the women had subsided, agents returned to quelling the ongoing obstruction activities of Porter's friends and family.  Significant law enforcement resources also were dedicated to reviewing the devices seized from Porter's residence and the content of numerous Facebook accounts that had been obtained through search warrants.  These efforts confirmed that digital devices had been removed from Porter's residence by his family members and that Porter had directed his family members to attempt to contact and influence witnesses against him.  The Facebook accounts revealed that Porter used Facebook Messenger to arrange his sexual abuse of the three minor victims with Kathy M., Josh Aldridge, and Charity Rawlins, to procure the pills he traded for sex from Jonathan David Flagg, and to brag about his sexual exploits to W. David Cole ("Cole") and Frank Andrews ("Andrews").  The review of Porter's devices also revealed another recording Porter made of his sexual assault of Kathy M.'s daughter.  Although the camera was partially covered during the vast majority of the recording, there were visible details that confirmed it depicted Porter's bedroom.  Worse yet, the blocked camera did nothing to dull the audio, which clearly depicted Porter and Tasha S. performing sex acts on the little girl.

D.    *Arriving at a plea on the eve of trial, Porter pleads guilty more than two years after his arrest and with only one codefendant remaining.*

After more than two years of investigation, a federal grand jury returned a Second Superseding Indictment in October of 2020, charging Porter and 10 co-defendants with adult and

child sex trafficking conspiracies, substantive counts of child sex trafficking, drug trafficking, child pornography offenses, and various obstruction and witness tampering crimes. After numerous co-defendants pled guilty, the Court set a final trial date for August 22, 2022. At that point, Porter and four co-defendants had not yet pled guilty, and *Lafler* hearings were conducted for all those co-defendants. At Porter's *Lafler* hearing in June of 2022, the government informed the Court that it had verbally indicated to Porter's counsel that it was willing to offer a plea to three counts of the Second Superseding Indictment, specifically one substantive sex trafficking charge, the drug conspiracy charge, and either the child exploitation or sex trafficking conspiracy counts. The offer would allow the defendant to argue for imposition of the 15-year mandatory minimum applicable to the sex trafficking charge. The government further discussed that it had been informed by counsel on April 12, 2022, that Porter was unwilling to accept the proposed plea and would only accept an offer that included a stipulated sentence of 15 years. Counsel for the defendant indicated that the government's offer was illusory.

Four months later, on the eve of trial, counsel for the defendant indicated at the final pretrial conference that resolution of the case was possible if the government were to make a real offer. Although counsel did not provide any indication as to what a "real" offer might entail, the government acted in due diligence and made the appropriate inquiries of counsel. During further discussions, counsel informed the government that the defendant would accept a plea offer to four counts of the Superseding Indictment – both substantive sex trafficking of minors charges, the sex trafficking of adults conspiracy, and the drug trafficking conspiracy – with an agreed range of 15 to 55 years. The government provided the written plea agreement incorporating this offer to the defense within a day or two of the verbal agreement, and the defendant pled guilty two days prior to the date jury selection was scheduled to commence.

The only co-defendant who ultimately did not plead guilty was Joshua Aldridge. His trial commenced, as scheduled, on August 22, 2022. Tasha S., Kathy M. and Charity Rawlins all testified at his trial. He was convicted on all charges.

Porter's final Presentence Investigation Report (PSR) was filed on December 14, 2022. The PSR included two attachments documenting Porter's objections to the calculations of the sentencing guidelines contained therein and the government's responses to those objections. On March 3, 2023, the defendant submitted a sentencing memorandum under seal. In that memorandum, he lodged additional objections to the PSR's guideline calculations, and suggested that the mandatory minimum sentence of 15 years is appropriate.

## II.     ANALYSIS AND SENTENCING RECOMMENDATION

There are some crimes so heinous that the only sentence that can achieve justice is the longest one available. In his sentencing memorandum, Porter argues for imposition of the 15-year mandatory minimum because he believes it to be a life sentence. Whether that is true remains to be seen, as neither the government, defense counsel, nor the Court have a crystal ball into the future. What is inescapably true, and what the defendant fails to admit or understand, is that he is the reason so many children and vulnerable women have suffered incomprehensible traumas from which they may never recover. His sentence cannot be akin to the sentences of those who acted only to appease his demands and avoid his wrath – and then readily admitted their culpability. A sentence of 55 years, the longest available to the Court, will not only ensure that the defendant remains incarcerated for the remainder of his natural life and can never again harm another individual, but is also supported by the Section 3553(a) factors. This sentence is what justice calls for and what is appropriate under federal law.

A.      *The Presentence Investigation Report and the Guidelines*

As the Court is aware, the first steps in determining an appropriate sentence under federal law are accurately calculating the sentencing guideline range and determining whether the guidelines provide a basis for departure from that range. *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *Rita v. United States*, 551 U.S. 338, 351 (2007). The government believes that the guideline calculations were accurately completed by the Probation Officer as reflected in the final PSR. The guideline calculations result in a recommended sentence of lifetime incarceration. The government concurs with the Probation Officer's determination that there are no bases for departure under the guidelines. As such, the first steps in the sentencing paradigm indicate that the defendant should receive a life sentence.

What's more, the sentence recommended by the guidelines would remain unchanged even if the Court were to grant each of the defendant's objections to the Probation Officer's calculations. Prior to the application of Chapter 5, Part A, Application Note 2 of the Sentencing Guidelines, the defendant's Total Offense Level is 58. If the defendant's objections to the various specific offense characteristics were granted, his Total Offense Level would likely be 47. Regardless of whether the Total Offense Level is 58 or 47, Chapter 5, Part A, Application Note 2 requires that the number be reduced to 43. That is the Total Offense Level upon which the life sentence recommendation is based and it is unchanged by any of the defendant's objections.

Although the defendant's objections to the guideline calculations are irrelevant to the determination of the actual guideline recommended sentence, a correct calculation of the sentencing guidelines requires that they all be overruled. As an important threshold matter, many of the defendant's objections are contrary to information to which he agreed in the statement of facts that supported his guilty plea.

The defendant objects to the application of five enhancements relevant to his offense against Tasha S. and three enhancements relevant to his offense against Kathy M.  In essence, he argues that these women were addicts who voluntarily had sex with him, his friends, and children, sold their children to him, and then made up stories after the fact about his threats and violence to gain sympathy or attempt to explain away their actions.  The defendant's argument remains offensive.  More importantly, it is refuted by the statement of facts to which the defendant agreed, by common sense, and by the credible and sworn testimony provided at the trial of Joshua Aldridge.  In the statement of facts, which the defendant signed and verbally agreed to in court while under oath, he admitted that: 1) he demanded that Tasha S. perform sexual acts for drugs; 2) he physically assaulted Tasha S., threatened her and her family, shot a gun by her ear, and duct taped her as a form of abuse and to force her to engage in sex acts with minors; and 3) he began giving Tasha S. free drugs when she was 14 years old.  The defendant also admitted that he engaged in similar assaultive and threatening conduct against Kathy M., including shooting a gun directly by her ear.  Both women testified consistent with these agreed facts, and these facts support the enhancements under USSG §§ 2A3.1(b)(1), (b)(4)(B), 3A1.1(b)(1), and 3A1.3.

The defendant's objection to the enhancement under USSG § 3B1.1(c) as it is applied to the offenses involving Tasha S. and Kathy M. is factually inaccurate.  He was not assigned a four-level increase for his supervisory role in sex and drug trafficking conspiracies involving five or more people.  Rather, the Probation Officer applied a two-level increase for the defendant's supervisor role in the sex trafficking conspiracy.  This enhancement is appropriate because it was the defendant's sick and twisted sexual deviancies that were the impetus for the drugs-for-sex

exchange that the defendant led and in which Joshua Aldridge, Andrews, and Cole were participants.

The defendant also is deserving of a supervisory role enhancement as it pertains to the drug trafficking conspiracy. While the defendant contends that the drug trafficking was David Flagg's conspiracy, this view ignores the fact that the conspiracy involved people other than Flagg. It was the defendant who recruited Cole and Andrews to assist him in obtaining pills from Flagg, and Flagg had no supervisory control over either of those individuals. It was the defendant that directed these two co-conspirators' actions, and he was also the person in the conspiracy who received most of the profits, both in the form of money and sexual acts. Because his supervisory role in this conspiracy only applied to Andrews and Cole, his enhancement should be two levels pursuant to USSG § 3B1.1(c).

In addition to reiterating the objections he previously raised to the PSR, the defendant added new objections pertaining to the minor victims in his Sentencing Memo. For all three minor victims, he reiterates that none of them should be considered vulnerable victims pursuant to USSG § 3A1.1(b)(1) and now also claims that the application of the enhancements for undue influence (USSG § 2G1.3(b)(2)(B)) and commission of a sexual act (USSG § 2G1.3(b)(4)(A)) constitute double counting. Beginning with the undue influence issue, this is not an inherent part of the offense for any of the minor victims as one can traffic a minor without engaging in acts that "compromised the voluntariness of the minor's behavior." USSG § 2G1.3, Application Note 3(B). Furthermore, the application notes state that there is a rebuttable presumption that undue influence exists where a defendant is at least 10 years older than the minor. *Id*. Porter was in his 60's when he raped the minor victims. They ranged in age from seven to 13 years old. He also

gave them drugs and threatened one of them with a gun. The undue influence enhancement is properly applied.

Similarly, a person can commit sex trafficking without committing a sex act. The act required for an offense under 1591 is harboring, recruiting, obtaining, transporting, etc. with the knowledge that the object of the offense will be caused to engage in a commercial sex act. If an offender engages in those acts with the requisite intent, it does not matter whether a sexual act is committed. Here, the defendant repeatedly committed such an act, and the enhancement is correctly applied.

The defendant's continuing objection to the vulnerable victim and supervisory role enhancements pertaining to the minor victims is also incorrect. The defendant claims that he did not target anyone, continuing his logic-defying story that Charity Rawlins, Kathy M., and their significant others just showed up at his door willingly offering their children for his drugs. That is not what happened in this case. The defendant preyed on the vulnerabilities of the addicted parents by fronting drugs when no one else would, which, for Tasha S. started when she was only 14 years old. Porter also knew the married women faced not only the effects of withdrawal if they couldn't obtain pills, but abuse from their husbands as well. In a calculated step, Porter first traded drugs for sex acts with the adult women. Once they were deep in their addictions and accustomed to trading their own bodies for drugs, Porter dropped the ultimate hammer: no more drug fronts unless and until they brought their children to him. His actions were premeditated to bring about the precise results he obtained, and those results would not be possible if he had not targeted children who were vulnerable because of the addictions of their guardians. All three minor victims were particularly vulnerable, and the enhancement is correctly applied for the defendant's offenses against them.

To the extent that the defendant's objection to the supervisory role enhancement as it pertains to the minor victims is based on the same facts as his objection to this enhancement for the adult victims, it is factually inaccurate. The conspiracy involving the sex trafficking of the minor victims did not involve David Flagg. Rather, the defendant directed the actions of all the individuals who he convinced to sell their children to him or engage in sex acts with children for drugs. Those individuals included Kathy M., Joshua Aldridge, Tasha S., and Charity Rawlins. He also directed the actions of Cole and Andrews, who aided him in procuring drugs and transporting the women and children to or from the defendant's house. He led and managed this entire organization, and the supervisory role enhancement is correctly applied.

The defendant's final objection as it relates to the calculation of the guidelines is that he is entitled to acceptance of responsibility. He argues that he pled guilty "as soon as a real offer was extended," even though that date was less than a week prior to trial, and should therefore be granted a two-level reduction in offense level. Given the factual background laid out above relating to the plea discussions and the defendant's rejection of a plea offer not different in any significant way from the plea agreement he eventually entered, the government does not agree with his characterization of his acceptance of responsibility. Even so, were the defendant actually accepting responsibility for his actions the government would agree that he is entitled to a two-level reduction. The defendant has not done so. His objections to the PSR fly in the face of the facts to which he agreed. Again, the defendant's revisionist storytelling suggests that Tasha S. and Kathy M. voluntarily had sex with him and sold their children to him as uncoerced commercial transactions. The statement of facts that he agreed under oath were correct reflects no such thing. Indeed, if he had not coerced, threatened, and committed violence against the women, he could not have been convicted of sex trafficking by force, fraud, or coercion. Unless

and until he admits that he committed such acts, he is not entitled to any reduction for acceptance of responsibility.

Although not relevant to the guideline calculations, the defendant also objects to the inclusion of information in the PSR that is based on statements of witnesses that were not provided to him. The defendant's arguments are again factually inaccurate. While the government did not turn over statements of cooperating co-defendants due to his guilty plea, none of the information in the PSR or upon which the government intends to rely at sentencing is based on those undisclosed statements. The government turned over two rounds of *Jencks* material to the defendant prior to his guilty plea, and those materials included recorded statements and FBI summaries of witness statements, including those of Kathy M., Tasha S., and all three minor victims. Further, on August 8, 2022, before moving forward with the guilty plea, the defense requested copies of the summaries of proffer statements of Kathy M. and Charity Rawlins. The government provided those reports the following day. The defendant never requested, and the government does not possess, any such summary from Tasha S. Her trial testimony is the written record of her statement, and the transcript of that testimony was provided to the defense.[1] The only undisclosed materials pertaining to any of these victims or witnesses are protected by the Federal Rules of Evidence or Local Rules of this Court.[2]

---

[1] While the defendant correctly asserts that he did not have the opportunity to cross-examine Tasha at trial, that is because he gave up the right to confrontation of witnesses as part of his guilty plea.

[2] To the extent that the defense's argument is based on the government's statement in its objection letter response indicating that other co-defendants observed Porter's violence, those statements are contained in the PSRs for those defendants and are protected from disclosure pursuant to Local Rule 32.1. The government does not intend to rely on those statements at sentencing and will withdraw any reliance on them in its response to the defendant's PSR objections. If the Court intends to rely on statements contained in PSRs of co-defendants, the government has no objection to the Court ordering disclosure of the relevant portions of those PSRs to the defendant.

B.    *The Factors Under 18 U.S.C. § 3553(a)*

After the Court has calculated and considered the sentencing guidelines, the final step in the sentencing process is applying the factors listed in 18 U.S.C. § 3553(a) to arrive at a sentence that is sufficient but not greater than necessary to meet the statutory goals of sentencing, which generally are retribution, deterrence, and rehabilitation.   The factors that § 3553(a) delineates are: (1) the nature and circumstances of the offense/history and characteristics of the defendant; (2) the statutory purposes of sentencing; (3) the kinds of sentences available; (4) the kinds of sentences and sentencing ranges as set forth in the Sentencing Guidelines; (5) Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.   While all these factors call for the 55-year sentence the government requests, the most significant are the nature of the offense, the history of the defendant, and the statutory purposes of sentencing.

1.    The Nature of the Offenses and the Circumstances Surrounding Them Rank Among the Most Horrific.

The defendant raped three little girls from the time that they were around seven years old. He did so numerous times a week for up to five years.   He did not feel shame about the pain he was inflicting on these fragile young children; rather he bragged about his sexual conquests to his friends and claimed that he was going to marry one or more of the girls.   This adult man, who was in his sixties at the time, believed that it was appropriate to plan marriage to a child not yet old enough to fully understand what sex means.   Whether these actions and plans are those of a "monster" is a question that the government will not address in the context of sentencing.   The more significant question is the impact of the defendant's actions on all his victims, and that impact was undoubtedly monstrous.

The timeline of Porter's offense conduct and the ruined lives that conduct caused starts around 2007, when Tasha S. was 14 years old. She first visited the defendant's home because she was friends with one of his daughters and she would occasionally spend the night there. It was during one of those sleepovers that she first experienced the defendant's sexual proclivities, when he "accidentally" brushed up against her private area while tucking her in. The defendant was known in the community to be a source of marijuana and he provided the drug for free to the young Tasha. As she graduated to harder drugs, mainly oxycodone pills, Porter initially also gave those to Tasha for free. Tasha eventually became addicted, and the pills she needed to stay well eventually came with a price tag. Although Tasha worked intermittently, she could not afford the price tag Porter had now affixed to the pills. A slave to her addiction and, therefore, to the man who could provide the pills she needed, she agreed to engage in sex acts with Porter as payment for those pills. Eventually, her sexual performances involved not just Porter, but also his friends, and it no longer matter whether she "agreed" to the sex acts. Porter had become violent, and Tasha was terrified of him. She knew that if she did not perform in the manner he wanted – or if she told anyone what was happening – not only would she be dope sick, she would also be subjected to physical assaults. The defendant's threats and assaults, which included shooting a gun by her ear and burning her with cigarettes, were why Tasha told no one when she saw the defendant abusing Magan R.'s and Charity Rawlins' daughters. And it was amidst this climate of drugs and fear that Tasha capitulated to Porter's final demand – that she engage in sex acts with Kathy M.'s daughters while the defendant watched or participated.

As Tasha described these events in her Victim Impact Statement, she was "terrified of Larry Dean Porter," who "had manipulating power of controlling people through his humiliating ways and this kept his victims from running away." She was "so consumed with fear" of the

defendant that she "didn't know what to do." As a result of the years of fear that she suffered at the defendant's hands, Tasha continues to endure panic attacks, flashbacks, and night terrors. She will live with those emotional scars, as well as the physical ones, for the rest of her life.

While the defendant was grooming Tasha to the point that she could not refuse any of his sexual demands, he was also laying the groundwork for his eventual assaults on Charity Rawlins' daughter, Minor Victim #3 (MV3). As with his calculated progression with the other women, Porter first fronted drugs to Rawlins and her husband, allowing them to pay him back when they received pay checks. However, when money became too tight and their drug addictions too severe, they were no longer able to repay their debts to the defendant. Knowing that Rawlins faced the threat of violence from Ronnie if she did not obtain the drugs they both needed, Porter took the next step in his plan, acclimating Rawlins to the idea of trading her own body to him in exchange for the pills. Then, when the time was right, he made the final demand. He no longer would accept sex with Charity as payment for the drugs; she had to bring him her daughter. Charity, concerned more about her need for drugs and avoiding the wrath of her husband than the welfare of MV3, agreed to Porter's demand.

The sexual assaults began when MV3 was seven, eventually included vaginal penetration, and continued until she was 13. She has suffered ongoing mental anguish as a result of the many years she endured the defendant's repeated sexual assaults and the fear he instilled in her. She began self-mutilation when she was 10, and attempted suicide when she was 13. That attempt was prompted by flashbacks of the abuse Porter inflicted, which became prevalent when she was in a relationship with a teenage boy. She has been in and out of mental health facilities consistently since 2021, largely due to her ongoing self-harming behaviors. As she

recognizes, her battle with the demons that the defendant and her mother have inflicted on her will be life-long.

The final brick in the defendant's house of horrors was the addition of Kathy M. and her two daughters, Minor Victim #1 (MV1) and Minor Victim #2 (MV2). At that point, Tasha was firmly under the defendant's control, and Charity had abdicated any semblance of motherly protection of MV3. Kathy M. had similar vulnerabilities as the other two women: she was poor and increasingly drug addicted, with an equally addicted significant other, Joshua Aldridge ("Aldridge") who became violent when deprived of drugs. She also had underlying mental health issues and suffered from fetal alcohol syndrome. She and Tasha had become acquaintances through their regular visits to Porter's house for drugs, and when Kathy and Aldridge found themselves unable to pay their drug debts to the defendant, Aldridge explained to Kathy that Tasha paid for her pills with sex. It was not long after that Kathy acquiesced to do the same. Once she did, her experiences mirrored Tasha's. Porter threatened and assaulted her, on one instance shooting a gun so close to her ear that her hearing was permanently impaired. The stage being appropriately set with terror and a haze of drugs, the defendant issued the same type of demand to Kathy as he had with the others – bring her kids to him if she wanted more drugs. Kathy abandoned her role of motherly protector just as the others had done and submitted to Porter's demand.

During the following four to five years, the defendant's abuse took myriad forms. Sometimes he demanded that Tasha perform sexual acts on MV1 or MV2 while he watched. Sometimes he participated in the sex acts with Tasha and MV1 or MV2. Sometimes he sexually assaulted MV1, MV2, and MV3 all at the same time, while other times he assaulted them individually. Whatever the configuration, the result was the same. The women and children

were abused, assaulted, terrified, have suffered physical and emotional trauma, and are facing lifetimes trying to heal the scars that the defendant's abuse created.

That is the nature of the defendant's offense conduct. It is emotionally painful just to learn about, let alone live through. It has caused irreparable damage, and the sentence must reflect the gravity and nature of that harm.

The defendant perceived no harm, no immorality, and no impropriety in his barbaric treatment of these women and children. Perhaps that is because he saw them not as children or as humans, but merely as he described to Cole: "[g]etting some pussy." Perhaps it is because there is something so flawed in his brain that he actually believed it when he told Andrews things like MV 2 was in love with him. Whatever the reason, the defendant's words and actions while he was committing these atrocities made clear that he had no qualms and no remorse for the massive harm he was inflicting, and that nothing, not even erectile disfunction, would stop him from continuing to indulge his deviant sexual desires.

Nor did his initial arrest change his attitude. Unlike his co-defendants, the defendant denied his actions and the harm those actions caused for more than two years. More than that, he enlisted his family and friends to try to cover up his crimes, suggesting that they pay off or "put a slug" in witnesses. Even now, as he faces sentencing, the defendant has expressed no remorse. Rather, he has cast the blame on the mothers, claiming that this was all their decision. Charity Rawlins, Tasha S., and Kathy M. did horrible and unimaginable things to the children because they were too weak and selfish to refuse the defendant's demands. They are paying for those crimes. But the women did not have a sexual interest in children. The women did not prey upon children. The women did not view the children as objects existing merely to satisfy their own sick and twisted sexual desires. The lifetimes of pain that the children must endure are the result

of Larry Dean Porter's sickness and his ongoing scheme to manipulate and control the women and their children. His offenses are the cause of the pain of all the individuals ensnared in his scheme, and his sentence should reflect his role and that pain.

      2.   <u>The Defendant's History and Characteristics Exacerbate the Offenses Rather than Mitigate Them.</u>

The defendant's history and background are one in the same with his offense conduct. His sexual abuse and violence did not start with Tasha S., Kathy M., and the minor victims. It started in 1978 when, at the age of 27, he married a 15-year-old girl who he fell in love with after seeing her playing on a park playground near his home. He was a predator then and he remained a predator up until the day of his arrest at the age of 69.

After marrying his child bride, he subjected her to years of physical abuse and death threats. Leaving him without having a stable roof over her head was a more favorable option than continuing to live with the fear he instilled. After his first wife left him, the defendant moved on to another woman nearly half his age. His second wife, who had two young children, had been injured at work and was prescribed pain medication as a result. However, once she became involved with Porter, her drug abuse escalated. That escalation allowed the defendant the access to her children he needed. D.Y. once told her mother when the defendant threatened to "grab her boobs." Her mother then left the defendant, but returned after he attempted suicide and then apologized for the comment he made to D.Y.

After the suicide incident, the defendant's physical and sexual abuse of both children progressed. He fed the son, S.L., marijuana to "treat" the child's ADHD and began giving D.Y. pain pills when she was around 11, ostensibly to treat her soreness from playing basketball. The defendant used fear, threats and physical violence to keep S.L. quiet about the sexual abuse, which eventually included oral sex and anal penetration. For D.Y., these threats, combined with

the increasing amounts of drugs the defendant provided to her made her feel trapped. She
believed she had to stay with the defendant and engage in the oral and vaginal sex acts he
demanded in order to save her family. She managed to escape the defendant when she was 15
but remains fearful of him to this day.

Porter's sexual abuse of children not living in his home appears to have started with D.H.,
who first met Porter when she was approximately seven years old, around 2006, while visiting
Porter's residence with one of her best friends and the friend's mother, Terri H. Beverly H.,
D.H.'s mother, was a severe alcoholic who also abused prescription drugs, and she and D.H.
were often homeless – perfect targets for the defendant.

D.H. was taken to Porter's residence by Terri H. and Beverly H. where D.H. suffered
various types of molestation and sexual abuse. Inappropriate touching eventually led to
numerous instances of rape, including occasions on which Porter provided drugs or alcohol to
D.H. to facilitate his sexual assault on her. D.H. was 10 years old the last time Porter raped her,
which would have been in approximately 2009.

Porter's next victims were A.C. and D.R, children of Magan R. As with the other women
who sold their children to Porter, Magan R. was addicted to pain pills and obtained those pills
from Porter by performing sexual acts on Porter, Cole, and T.S. The now familiar pattern
emerged: the defendant demanded her children. Porter first raped A.C. when she was
approximately five years old. Porter also directed Megan R. to perform oral sex on A.C. Porter
also sexually abused D.R. at least three times when he was roughly six years old.

The government acknowledges that the defendant's own childhood involved some level
of trauma and that he undoubtedly saw horrific things while serving in Vietnam. However, none
of the issues raised in the more than 30 pages that the defendant has devoted to the discussion of

his childhood, military experiences, and age-related health problems excuse or explain his decades of sexual and physical abuse of a multitude of victims. The defendant's arguments suggest that his own life experiences and life expectancy should outweigh the unimaginable harm experienced by the women and children upon which he preyed and the danger posed by his actions. Such an argument ignores the dictates of § 3553(a) and case law refuting the same or similar arguments.

The defendant submitted the findings of a life expectancy expert to suggest that he should receive a more lenient sentence because he is not likely to live more than another approximately seven years. Given that the defendant was nearly 70 years old at the time he continued to commit several of the offenses for which he was charged or convicted, this argument "implies that being nearer the grave confers a license to violate the law, or at least a discount on the consequences." *United States v. Lamb*, 431 Fed. Appx. 421, 427 (6th Cir. 2011). In *Lamb*, the Sixth Circuit found such an argument to be highly suspect. *Id*. Indeed, following the defendant's line of thinking, any time an older defendant committed a crime, he or she would receive a lesser sentence regardless of the severity of the crime or any other factor. That is not what § 3553(a) directs and it is fundamentally at odds with fair sentencing practices. This argument is particularly inapplicable in this case where co-defendant Andrews, who also served in the Vietnam war, also grew up in the same rural and depressed economic areas as Porter, suffers from similar or more significant health problems as the defendant, committed far less atrocious crimes, and accepted responsibility immediately received a sentence of approximately ten years. That the defendant, who again, committed many more and much more heinous acts than Andrews, should get only five years more is illogical in the extreme.

The life expectancy argument also ignores the fact that it is only because the defendant successfully evaded justice for so many years that he now faces a lengthy term of incarceration when he is elderly.  As the Eleventh Circuit has found, "in these circumstances rewarding [the defendant] for being older rewards him for evading detection and it is unreasonable to do that." *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010).

The defendant's lengthy and repeated allegations of his own sexual abuse should also hold little weight in determining an appropriate sentence for his decades of criminal acts.  First, to the extent the defendant suggests there is a correlation between being a victim of child molestation and his serial, sexually exploitative conduct of numerous women and children, correlation is not causation.  Furthermore, even a correlation, while attractive as an explanation for inexplicable conduct, is not supported by reality.  If being sexually abused makes one more likely to offend in the same manner, girls, who make up a disproportionately large percentage of child exploitation victims, would also make up an equally large percentage of child exploitation offenders.

Research in this area further refutes the correlation or causation concept.  "The victim-offender cycle in male sexual abuse has been popularized as an explanation of why some males sexually offend.  However, there are serious limitations to this explanation."  Lambie, Ian, et al., "Resiliency in the victim-offender cycle in male sexual abuse" in SEX ABUSE: A JOURNAL OF RESEARCH AND TREATMENT 14(1) (2002) at 43.  Indeed, the research has shown that "sexual abuse at particular ages and frequency of abuse do not of themselves necessarily lead to an increased likelihood of perpetuating abuse across generations." Briggs, F. and R. Hawkins, "A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders" in CHILD ABUSE &

NEGLECT 20(3) (1996) at 230. Similarly, other studies have suggested "legitimate concern regarding the validity of many of the self-reports of pedophiles who claim to have been abused as children themselves. These statements are often made in a legal or group treatment setting, in which pedophiles may be trying to mitigate their sentence or gain sympathy for their behavior." Hall, R.C.W., "A Profile of Pedophilia: Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues" in Mayo Clinic Proceedings 82(4) (2007) at 464. Indeed, "when verified by polygraph…the percentage of offenders who experienced sexual victimization in their own lives drops significantly." Hindman, Jan et al., "Shedding Light on the Histories of Sex Offenders Using Clinical Polygraphy" in The Sexual Predator (vol. IV) (2010) at 20-5. Given the ambiguity of any impact of prior child molestation, it should not be a significant factor in the sentencing decision.

Finally, the defendant's experiences in the Vietnam War should have no bearing on his sentence. While the atrocities of war are undoubtedly deplorable for any individual who must endure such experiences, neither the defendant's exposure to Agent Orange nor whatever his involvement was with brothels explains or excuses his serial rape of young children. Indeed, the statement from his half-sister indicates that his sexual proclivities toward children began well before the defendant joined the military. While the exposure to war and the toxic substances involved may have impacted his physical and mental health in other ways, none of those things caused nor excuse the decades of harm he has caused. As with his age and childhood traumas, his war experiences give this Court no reason to deviate below the 55-year sentence the government is recommending.

Finally, the defendant's experiences in the Vietnam War should have no bearing on his sentence. While the atrocities of war are undoubtedly deplorable for any individual who must

endure such experiences, neither the defendant's exposure to Agent Orange nor whatever his involvement was with brothels explains or excuses his serial rape of young children. Indeed, the statement from his half-sister indicates that his sexual proclivities toward children began well before the defendant joined the military. While the exposure to war and the toxic substances involved may have impacted his physical and mental health in other ways, none of those things caused nor excuse the decades of harm he has caused. As with his age and childhood traumas, his war experiences give this Court no reason to deviate below the 55-year sentence the government is recommending.

3.  The Statutory Purposes of Sentencing, and Justice, Require a 55-year Sentence.

Section 3553 directs courts to impose a sentence designed to meet the goals of sentencing. As delineated in § 3553(a)(2), those goals are: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (2) provide adequate deterrence; (3) protect the public; and (4) provide the defendant with needed rehabilitation, educational/vocational training or medical treatment. The first subfactor has been referred to as the "just desserts" concept, answering the need for retribution so that the punishment fits the crime, and the defendant is punished in a just manner. *Irey*, 612 F.3d at 1206. While it may "overlap to some extent with the 'nature and circumstances of the offense' component," *id.*, it further is designed to reflect "the harm done or threatened by the offense." *United States v. Pugh*, 515 F.3d 1179, 1195 (11th Cir. 2008) (quoting S.Rep. No. 98–225, at 75–76, 1984 U.S.C.C.A.N. at 3258–59).

As articulated throughout this memorandum, it is the harm that the defendant's offenses have caused to so many people that are the paramount issue in this case. The defendant's sexual assaults on women and children took place for more than 15 years and their recovery from the

damage he inflicted, if such recovery is even possible, will take many more year than 15 years, most likely the rest of their lives. Fifteen years is also the minimum applicable to just one of the defendant's child sex trafficking convictions. This indicates that *if* the defendant had only committed one such crime and *if* he had committed the crime in the least serious and least harmful way possible, only then would the 15-year mandatory minimum be appropriate. Porter committed his crimes against numerous minors, stands convicted of two separate sex trafficking offenses against minors, as well as adult sex trafficking and drug trafficking conspiracies, and committed all those offenses in aggravated ways involving violence, manipulation, and obstruction. For a sentence to actually reflect these crimes and the harm they have caused, it must be far above the mandatory minimum and should correlate to the decades that the defendant perpetuated the offenses and that the victims will continue to suffer. *See Irey*, 612 F.3d at 1206 ("The seriousness of a crime varies directly with the harm it causes or threatens. It follows that the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime.")

The next two sentencing goals, deterrence and protection, are intertwined concepts, not just for the defendant but also for others who may similarly have no natural inclination to understand or care about the incredible harm caused by such abusive actions. Given the defendant's unwavering determination to maintain a steady supply of victims to feed his insatiable and perverse sexual appetite, it is highly doubtful that anything other than prison will deter him from returning to his ways. A return to his prior actions means significant danger to all vulnerable women or children that may cross his path. For those who have similar sexual tendencies as Porter and also share Porter's lack of any sense of humanity that would otherwise prevent them from imposing their sexual desires on unwilling little girls, this Court must also

send a message that will hopefully deter them from following a similar path. Indeed, in cases involving the sexual exploitation of children, general deterrence is a particularly important consideration, as it is only reduction of the abusive acts that will save additional children from irreparably damage.

As to the final sentencing goal, which can generally be described as rehabilitation, the government realizes that the defendant does have physical health issues as a result of his age and likely due to his wartime experiences. However, his life expectancy report indicates that some of these issues may at least be exacerbated by the defendant's lack of insight into his health issues and noncompliance with medical recommendations. Furthermore, the health conditions from which he suffers are common ones for which the Bureau of Prisons can provide care. *See United States v. Bistline*, 720 F.3d 631, 634 (6th Cir. 2013) ("[Defendant] may be elderly and in poor health, but 'the elderly do not have a license to commit crime, and adequate medical care is available in federal prisons.'") (quoting *United States v. Moreland*, 703 F.3d 976, 991 (7th Cir. 2012)). The rehabilitation or other medical needs of the defendant do not warrant a 15-year sentence, and all other factors this Court is to consider call for the longest sentence possible.

C.    *Restitution Pursuant to 18 U.S.C. §§ 1593 and 3663(a)(3)*

The final sentencing factor the Court is to consider under § 3553(a) is the need to provide restitution to the victims. The PSR reflects that restitution is owed to the victims of the offenses of conviction, specifically Tasha S., Kathy M, MV1, MV2, and MV3, as well as government entities that have paid for treatment and other services for the minor victims. It further indicates that three identified victims of the defendant's child pornography possession conduct are entitled to restitution. These findings are in accordance with 18 U.S.C. §§ 1593, 3663(a)(3) and the Plea Agreement in this case.

The defendant objects to the PSR's findings regarding restitution, arguing that the loss calculations are speculative and improperly based on the gain to the defendant versus the victim's actual losses. Aside from the fact that his objection to restitution is likely a violation of the terms of his plea agreement, this argument also ignores the applicable statutory provision. The defendant's convictions related to Tasha, Kathy, and the minor victims were pursuant to 18 U.S.C. § 1591. As such, the relevant restitution provision is 18 U.S.C. § 1593. This statute provides that restitution shall be ordered not only for the "full amount of the victim's losses," but also for "the gross income or value to the defendant of the victim's services or labor." 18 U.S.C. § 1593(b)(3). The calculations contained in the PSR are based on the value to the defendant of the victim's services and are thus appropriate under § 1593(b)(3). That value "need not be proven with exactitude," and "estimates are permitted as long as there exists some reasonable and reliable evidence of the victims' losses." *United States v. Bixler*, 2022 WL 247740, at * 11 (6th Cir. January 27, 2022). *See also United States v. Williams*, 5 F.4th 1295, 1305 (11th Cir. 2021) (In establishing restitution based on estimates of how much victims earned as prostitutes, district court properly relied on "credible evidence, including trial testimony, that provides a reasonable and reliable estimate of the victims' losses"). Furthermore, because the statute provides for "gross income or value," the restitution paradigm for trafficking victims does not contain the same "windfall" prohibition about which the defendant complains. *See Williams* 5 F.4th at 1305-1306.

Tasha S., Kathy M., and the minor victims all provided sexual services to the defendant and/or his friends. Those services were commercial sex acts that had value. While the value of such services is likely much greater than the price of the one to two pills that the defendant placed on them, that is the conservative estimate that the Probation Officer utilized and which is

based on the credible testimony of the women. Restitution for these sex trafficking victims in the amounts listed in the PSR is appropriate.

The defendant's objection to the restitution information contained in the PSR indicates that he objects to the restitution listed on pages 21 through 23 of the PSR. This includes the amounts payable to the Ohio Crime Victims Compensation Program for counselling costs for MV1 and MV2. The defendant has provided no argument as to the propriety of this restitution amount or the restitution amounts payable to Scioto County Children's Services for the ongoing treatment of MV3. The government thus presumes that the defendant does not object to these restitution amounts, and requests that the Court include them, in addition to the amounts attributable to the value of the victims' commercial sex acts, in an order of restitution included in the Judgment Order.

The defendant's objections also fail to show that his possession of identified child pornography victims did not cause harm to the victims. Such an argument is contrary to the mandates of 18 U.S.C. § 2259 and the defendant's plea agreement. The government does believe that, in order to ensure the greatest amount of restitution to the hands-on victims of the defendant's sex trafficking offenses, the minimum amount of $3000 is an appropriate award to each of the child pornography victims.

The government further requests that the Court enter its judgment order in a manner that will allow the victims to collect moneys immediately, including funds that the defendant may have sought to hide from creditors or the government since his incarceration. The PSR indicates that the defendant's power of attorney has been cashing the defendant's monthly retirement income payments from the Veterans Affairs and keeping significant portions of those payments as cash. So that the victims may collect the amounts owed to them immediately from any funds

or property that the defendant may now own, (including constructively) or that may come into

his possession in the future, the government requests that the Court make payment due

immediately and include, along with the standard payment language, the following additional

language in the Judgment Order:

The full sum or amount of ordered restitution is due immediately. This restitution order constitutes an enforceable judgment, pursuant to 18 U.S.C. § 1593, 18 U.S.C. § 3613 (a), (c) and (f) and § 3664 (m)(1)(A). Any schedule of payments imposed by the Court is merely a minimum schedule of payments and will not be the only method, nor a limitation on the methods, available to the United States to enforce the criminal judgment, including without limitation by administrative offset. Consistent with 18 U.S.C. § 3664 (n), "if the [Defendant] receives substantial resources from any source…during a period of incarceration, he will be required to apply the value of such resources to any restitution still owed."

If any amount of restitution remains outstanding, the Court imposes a payment schedule of at least the following amounts

**Immediately:** Any non-exempt money or property of the defendant in the custody, control, or possession of The Veterans Benefits Administration (VA);

Any non-exempt money or property of the defendant in the custody, control, or possession of Martin Nagel;

The defendant shall cooperate with the United States in providing any information it needs to effectuate the garnishment of said moneys or property;

Upon service of a copy of this order by the USA on Martin Nagel, he shall hold any above-referenced property pending further order; and

Upon service of a copy of this order by the USA on the VA, it shall hold any above-referenced property pending further order.

## <u>CONCLUSION</u>

Larry Dean Porter spent multiple decades terrifying, assaulting, manipulating, and

abusing vulnerable women and children in Scioto County. Those victims will spend lifetimes

attempting to recover from the mental, emotional, and physical damage that the defendant

brought upon them. His sentence must reflect both the many years of suffering he has already

inflicted and the many years of recovery that the victims still face. A sentence of 55 years is necessary to account for the many lives he has damaged.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

s/*Heather A. Hill*
HEATHER A. HILL (0100920)
JENNIFER M. RAUSCH (0075138)
JESSICA W. KNIGHT (0086615)
Assistant United States Attorneys
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
(614) 469-5715
Fax: (614) 469-5653
Heather.Hill @usdoj.gov
Jessica.knight@usdoj.gov
Jennifer.Rausch@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum was served this 7th day of March, electronically upon all counsel of record.

s/*Heather A. Hill*
HEATHER A. HILL
Assistant United States Attorney